UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

---

YOUNG AMERICAN'S FOR FREEDOM, et al.,

      Plaintiffs,

v.                                                                    Case No. 3:24-cv-00163-ARS

U.S. DEPARTMENT OF EDUCATION, et al.

      Defendants.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

For decades, the Department of Education has relied upon the McNair Post-Baccalaureate Achievement Program to dole out "educational opportunities" based on ethnicity and race.[1] *See SFFA v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 204 (2023) (quoted source omitted). Through the program, the Department provides grants to universities. Doc. 1, ¶20. The universities are required to use the grants to create "projects" that help some—but not all—undergraduate students who are interested in pursuing graduate studies. *See id.* These students receive various benefits, sometimes including a stipend worth up to $2,800 per year and financial aid. 20 U.S.C. §1070a–15(f)(1); *see also* Doc. 1, ¶¶1, 52. In the 2023–24 academic year, the program supported nearly 6,000 students across 216 institutions of higher education, costing taxpayers over $60 million. Doc. 1, ¶20.

An undergraduate student is eligible to participate in a project only if he or she is "[a] member of a group that is underrepresented in graduate education" or "[a] low-income individual who is a first-generation college student." 34 C.F.R. § 647.3(c). The following races—and only the following races—are considered "underrepresented": Alaskan Native, American Indian, black (non-Hispanic), Hispanic, Native American Pacific Islander, and Native Hawaiian.[2] 34 C.F.R. § 647.7(b). A "low-income individual" means "an individual whose family's taxable income did not exceed 150 percent of the poverty level . . . ." *Id.* That level is set at $38,730 for a three-person household. *See Federal TRIO Programs Current-Year Low-Income Levels*, U.S. Dep't Educ. (Jan.

---

[1] Plaintiffs use "race" throughout this brief, often as shorthand for "ethnicity and race." While ethnicity and race are "analytically distinct," they are "subject to the same constitutional protection." *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1551 n.2 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997).

[2] Under 34 C.F.R. § 647.3(c)(3), the Secretary of Education may designate other "underrepresented" groups if the secretary has evidence to support that decision; however, no such designations appear to have ever been made. Doc. 1, ¶26 n.5.

1

11, 2024), https://www2.ed.gov/about/offices/list/ope/trio/incomelevels.html. At bottom, some students, because of their race, must be indigent to participate while others need not be. The racial eligibility criterion excludes Arabs, Asians, Jews, and whites (among others) unless they are poor.

As shown below, the racial eligibility criterion is unconstitutional on several grounds. As the United States Supreme Court has explained, "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). Among other issues, the criterion does not comply with strict scrutiny. *See SFFA*, 600 U.S. at 213.

This Court should preliminarily enjoin the Department from enforcing its racial eligibility criterion. In the coming weeks, many universities will begin accepting applicants for various projects. As presently required by the Department, these universities will employ the criterion. Months from now, this Court is likely to issue permanent relief; however, for many undergraduate students, that remedy will come too late. Their universities will no longer be accepting applicants and will likely not be able to claw back any federal funds already spent. Accordingly, a preliminary injunction is appropriate.

## FACTS

**I.    The McNair Program offers a variety of benefits to undergraduate students interested in pursuing graduate studies.**

For context, the purpose of the McNair Program, as provided by statute, is to "provide disadvantaged college students with effective preparation for doctoral study." 20 U.S.C. § 1070a-15(a); *see also* 34 C.F.R. § 647.1 (explaining the purpose of the program).

2

To effectuate this purpose, the Department awards grants every five years to universities on a competitive basis. Doc. 1, ¶20; *see also* 34 C.F.R. § 647.5 (explaining a grant period is five years).

A university that receives a grant must use it to create a project that offers participating undergraduate students the following services: "opportunities for research or other scholarly activities;" "summer internships;" "seminars and other educational activities designed to prepare students for doctoral study;" "tutoring;" "academic counseling;" and "activities designed to assist students participating in the project in securing admission to and financial assistance for enrollment in graduate programs." 20 U.S.C. § 1070a-15(b). Notably, students often receive other optional benefits, such as a stipend and financial aid.[3] *See* 20 U.S.C. § 1070a-15(f); *see also* Doc. 1, ¶¶1, 52.

## II. Universities employ the racial eligibility criterion when determining who may participate in a project.

A university cannot allow just any undergraduate student to participate in a project. The Department mandates that students meet four eligibility criteria:

- Be a "citizen" or "permanent resident" of the United States (or qualify as otherwise lawfully in the United States);

- Be "currently enrolled in a degree program at an institution of higher education" that receives federal funding;

- Have "not enrolled in doctoral level study at an institution of higher education;" and

- Be either:

  o "A member of a group that is underrepresented in graduate education;" or

---

[3] Additionally, a project may also offer: "education or counseling services designed to improve the financial literacy and economic literacy of students, including financial planning for postsecondary education;" "mentoring programs involving faculty members at institutions of higher education, students, or any combination of such persons;" and "exposure to cultural events and academic programs not usually available to disadvantaged students." 20 U.S.C. § 1070a-15(c); *see also* 34 C.F.R. § 647.4 (explaining what services a project must and can provide).

      o   "A low-income individual who is a first-generation college student."

34 C.F.R. § 647.3.

As already explained, the Department defines "groups underrepresented in graduate education" as including certain races and not others. 34 C.F.R. § 647.7(b). Additionally, the Department stresses during the grant application process that a university should "demonstrate[] that the project's target population is underrepresented in graduate education, doctorate degrees conferred[,] and careers where a doctorate is a prerequisite." 34 C.F.R. § 647.21(a). Indeed, in August 2022, a Department assistant secretary stated that the purpose of the racial eligibility criterion is to change the "demographic" makeup of "future physicians, professors, scientists[,] and other crucial professionals requiring graduate degrees." Doc. 1, ¶19.

Plaintiffs in this action include two undergraduate students, who attend universities with a project, specifically, the University of North Dakota (UND) and the University of Wisconsin-Madison (UW-Madison). Both universities employ the Department's regulations, including the racial eligibility criterion. Plaintiffs YAF is a nationwide student organization with thousands of members at institutions of higher education. *Id.*, ¶11. Plaintiff YAF-UND is a chapter of YAF on the UND campus. *Id.*, ¶10. Some YAF and YAF-UND members are ineligible to participate in projects because of their race. *Id.*, ¶¶6–7.

### A.    *The University of North Dakota employs the racial criterion.*

In the 2023–24 academic year, the project at UND had 28 participating undergraduate students. *Id.*, ¶31. Below is a screenshot from a website for the project overviewing the benefits these students were able to receive. *Id.*, ¶32.

## What the McNair Program Offers

- Graduate school preparation
- Faculty mentorship
- Academic and personal counseling
- Tutoring
- Seminars and workshops related to graduate education
- Research stipends

- Research opportunities and skill development
- Travel to local, regional, and national conferences
- GRE preparation
- Graduate school visits
- Academic advisement
- Opportunities for tuition and fee waivers

The website confirms that an undergraduate student cannot participate unless he or she is either "from a group underrepresented in doctoral studies" or a first-generation low-income student. *Id.*, ¶36. The website, however, does not explain what groups are underrepresented. *Id.*

Plaintiff Avery Durfee is a white female student in her third year at the UND who wanted to learn more after reviewing the website. *Id.*, ¶12. Plaintiff Durfee is interested in participating in the project because she wants to pursue graduate studies. *Id.* She would be a great applicant but for her inability to meet the racial eligibility criterion—she meets all other criteria. *Id.* She is a first-generation student; however, she is not a low-income student. *Id.* She is also the chairwoman of Plaintiff YAF-UND. *Id.*

Plaintiff Durfee emailed a UND official, asking if she could participate and was told that the project has a racial exclusion for white students who are not first-generation low-income students. *Id.*, ¶¶12, 40–42.

5

**B.     UW-Madison employs the racial criterion.**

UW-Madison, where Plaintiff Benjamin Rothove attends, runs a similar project. *Id.*, ¶48. Last year, it had 28 participating undergraduate students, and it anticipates having another 28 this year. *Id.*, ¶47.

Like UND, UW-Madison advertises that participating undergraduate students can receive many benefits. For example, students receive a chance to "[c]onduct research under the mentorship of UW-Madison faculty and researchers" and a stipend. *Id.*, ¶52.

UW-Madison employs the following eligibility criteria. *Id.*, ¶53.

To be eligible, a student must meet either criterion (1) OR (2). All students must meet criterion (3) (4) and (5):

1. First-generation college student as well as low income students. (TRIO Income Levels;  34B C.F.R. §647.7, 2023)

2. African American, Hispanic/Latino, American Indian (according to federal guidelines, Asian Americans, including Southeast Asian Americans are eligible under criterion 1); 34B C.F.R. §647.7, 2023)

3. A minimum cumulative Grade Point Average of 2.8 and completed 45 credits.

4. US citizen or permanent resident.

5. Able to participate in the program for a minimum of 12 full months (including a full summer) in order to meet all the mandatory aspects of the program.

Plaintiff Rothove would be an ideal applicant but for his race. He is white but is neither a first-generation student nor a low-income student. *Id.*, ¶13. He has above a 2.8 grade point average, has completed more than 45 credits, is a United States citizen, and is able to participate for a minimum of 12 full months. *Id.* Like Plaintiff Durfee, he desires to learn more about graduate studies. *Id.*

On July 25, 2024, Plaintiff Rothove sent the following email to a UW-Madison official: "Hello, I was curious if I am eligible for the McNair Scholars Program if I am not African

American, Hispanic/Latino, or American Indian. I do not come from a low-income family, and I am not a first-generation college student either. Thank you, Ben Rothove." *Id.*, ¶58. The director of UW-Madison's project responded: "As a federally funded program, we must adhere to the eligibility requirements set forth by the U.S. Department of Education (below). Therefore, you would not be eligible for the program . . . ." *Id.*, ¶59. The director concluded the email with a list of racial categories defining "underrepresented groups." *Id.*

### III.  The projects at UND and UW-Madison are indicative of how hundreds of universities across the nation employ the Department's regulations.

The projects at UND and UW-Madison are nothing out of the ordinary. Across the nation, hundreds of universities have similar projects that employ the racial eligibility criterion. *Id.*, ¶20. They have no choice: if a university wants a grant, it must follow federal law—which the Department administers and enforces—as explained by the director of UW-Madison's project. *Id.*, ¶¶29, 59.

Plaintiff YAF is a nationwide student association with members who are harmed by the racial eligibility criterion. *Id.*, ¶11. Plaintiff YAF has thousands of members at institutions of higher education across the nation. *Id.*, ¶¶7, 12. Many of these members are interested in pursuing graduate studies but are excluded from projects because of their race. For example, both Plaintiffs Durfee and Rothove are members. *Id.*, ¶¶12–13.

**IV.    The racial eligibility criterion has existed for decades, its end is not in sight, and it will be employed once again in the coming weeks.**

In the coming weeks, the racial eligibility criterion, which has been employed for decades, is going to be employed once again by universities all over the nation.[4] *See id.*, ¶60. Congress created the McNair Program in 1986 (although, it did not become known by that name until 1987). Higher Education Amendments of 1986, § 417D, Pub. L. 99-498, 100 Stat. 1268 (codified as amended at 20 U.S.C. § 1070a-15); Higher Education Technical Amendments Act of 1987, § 6, Pub. L. 100-50, 101 Stat. 335. In 1994, the Department promulgated a definition of "[g]roups underrepresented in graduate education," which is materially the same today as it was then.[5] Ronald E. McNair Postbaccalaureate Achievement Program, 59 Fed. Reg. 43986, 43990 (Aug. 25, 1994) (codified as amended 34 C.F.R. § 647.7). The criterion will continue to be employed into the foreseeable future (absent action from this Court). Doc. 1, ¶¶21–22.

## LEGAL STANDARD

This Court should consider four factors: (1) whether Plaintiffs have a substantial likelihood of success on the merits; (2) whether they face a substantial threat of irreparable harm; (3) whether a balance of hardships is in their favor; and (4) whether a preliminary injunction is in the public

---

[4] This is a list of just a few university websites that indicate universities are presently taking applications: https://und.edu/student-life/trio/mcnair-program/index.html (UND, "[s]top by the TRIO Office . . . for an application packet"); https://wisc.academicworks.com/opportunities/84051 (UW-Madison, deadline to apply is October 1, 2024); https://mcnair.ucsb.edu/apply (University of California Santa Barbara, deadline to apply is October 28, 2024); https://www.uwstout.edu/life-stout/mcnair-scholars-program (University of Wisconsin - Stout, deadline to apply is November 1, 2024); https://www.cehd.umn.edu/trio/mcnair-scholars (University of Minnesota - Twin Cities, deadline to apply is November 4, 2024); https://www.unr.edu/mcnair/join/apply (University of Nevada - Reno, deadline to apply is October 1, 2024).

[5] In 1994, the Department considered Alaskan Natives, blacks (non-Hispanic), Hispanics, and Native Americans to be "underrepresented." Since then, it has added only Native American Pacific Islanders and Native Hawaiians.

interest. *D.M. ex rel. Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). No factor is "determinative;" instead, the factors must be balanced together. *Id.*

Notably, the first factor is "the most significant," especially in the context of a constitutional claim partly because it overlaps with many of the other factors. *See Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022); *see also Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (explaining the first factor is "typically dispositive" in "constitutional cases").

In this action, the first and second factors largely overlap because the loss of a constitutional right, "for even minimal periods of time," is "irreparable." *See Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). As one district court explained, in the context of an "equal protection claim," irreparable harm is presumed. *See Pavek v. Simon*, 467 F. Supp. 3d 718, 754 (D. Minn. 2020).

Additionally, an administrative agency—in this action, the Department—can never claim a cognizable interest in enforcing an unconstitutional regulation or statute, so the first two factors effectively merge with the third. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Lastly, for a similar reason, when an administrative agency is the opposing party, the third and fourth factors are "merge[d]." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Vitolo*, 999 F.3d at 360 (explaining "it is always in the public interest to prevent violation of a party's constitutional rights").

**ARGUMENT**

**I.    Plaintiffs are likely to succeed on the merits.**

Plaintiffs are all but certain to succeed on the merits.[6] "[A]s a general rule," the government cannot consider race at all, "regardless of context." *Parents Involved in Comm. Schs. v. Seattle Dist. No. 1*, 551 U.S. 701, 753 (2007) (Thomas, J., concurring). Recently, the United States Supreme Court observed that the " 'core purpose' of the Equal Protection Clause" is "do[ing] away with all governmentally imposed discrimination based on race." *SFFA*, 600 U.S. at 206 (quoted source omitted). It held that racial preferences in college admissions are unconstitutional. It observed that *all* racial preferences must survive what it called the "daunting" test of strict scrutiny, i.e., race must further a compelling interest, and its use must be narrowly tailored to achieve that interest. *Id.* at 213. The Court provided further guidance in announcing twin commands—race may "never" be used as a "negative" or a "stereotype." *Id.* at 214. *All* racial preference that violates these commands fail strict scrutiny. Finally, even those rare uses of race that survive strict scrutiny and which do not place persons at a disadvantage due to race or embody racial stereotypes must be periodically reviewed with an end date in mind. *Id.* at 213. The Court emphasized that the admissions policies violated all of these rules. *Id.* The racial eligibility criterion employed in the name of the McNair Program do the same—and even a single failure is enough for Plaintiffs to succeed on the merits.

---

[6] Sometimes, the Eighth Circuit inquires whether a plaintiff has a mere "fair chance of prevailing." *D.M.*, 917 F.3d at 999. Other times, it considers whether a plaintiff is "likely" to prevail. *Id.* at 999–1000. The heightened standard is applied when a plaintiff challenges "government action based on presumptively reasoned democratic processes." *Id.* at 1000. This Court should apply the "fair chance of prevailing" standard. As explained more below, the Department is required to constantly re-evaluate the racial eligibility criterion, which must ultimately have a "logical end point." *SFFA*, 600 U.S. at 221. Even if the criterion once reflected the outcome of a presumptively reasoned democratic processes, in the context of equal protection claims, more is required. The Department's regulations have hardly changed since at least 1994. To Plaintiffs' knowledge, the Department has not seriously even considered updating the regulations. Accordingly, it has not re-engaged in the purportedly democratic process of rulemaking. Regardless, Plaintiffs can easily satisfy the "likely" to prevail standard.

### A.    *The racial eligibility criterion fails strict scrutiny.*

The racial eligibility criterion is unconstitutional because it fails strict scrutiny. Any exception must satisfy a "daunting two-step" test known as "strict scrutiny," even if the government claims its race-based decision-making is benign. *SFFA*, 600 U.S. at 206 (majority opinion); *see also Johnson v. California*, 543 U.S. 499, 505 (2005) (explaining *"all* racial classification" imposed by government in "every context" must be analyzed under strict scrutiny even when a classification is arguably "benign").

Accordingly, the Department must prove that the racial eligibility criterion furthers a "compelling" interest and that the criterion is "narrowly tailored"—i.e., "necessary" —to achieve that interest. *SFFA*, 600 U.S. at 206–07. The Department cannot do either.

1.    The Department lacks a compelling interest. The United States Supreme Court currently recognizes only two such interests: (1) "avoiding imminent and serious risks to human safety in prisons, such as a race riot;" and (2) "remediating specific, identified instances of past discrimination that violated the [United States] Constitution or a statute." *Id.* at 207. The Department is not attempting to further either. The criterion is not about safety. Additionally, to Plaintiffs' knowledge, the Department has never claimed that the criterion is about remedying past illegal discrimination; instead, it has indicated that the criterion is about racial balancing. Specifically, the Department claims that the criterion is about helping certain "underrepresented" minorities make it into and finish graduate school.

At bottom, the Department wants to change the demographic makeup of future professions (e.g., professors), but the United States Supreme Court has explained, "[r]acial balance is not to be achieved for its own sake." *Freeman v. Pitts*, 503 U.S. 467, 494 (1992). The "ultimate goal" of equal protection jurisprudence is to "eliminat[e] entirely from governmental decisionmaking such

irrelevant factors as a human being's race." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495 (1989) (plurality opinion). Racial balancing is at odds with this goal. *Parents Involved in Comm. Schs.*, 551 U.S. at 726 (plurality opinion); *see also SFFA*, 600 U.S. at 206 ("Eliminating racial discrimination means eliminating all of it."). Simply put, equal protection does not guarantee "racial parity" but rather forbids "racial discrimination." *See Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1570 (11th Cir. 1994).

For example, the United States Supreme Court has condemned a school district's goal of "attaining a level of diversity within the schools that approximates the district's overall demographics." *Parents Involved in Comm. Schs.*, 551 U.S. at 727 (plurality opinion); *id.* at 766–67 (Thomas, J., concurring) ("Environmental reflection . . . is just another way to say racial balancing.").

The Department's racial balancing is different only in scope from that of the district's. Instead of trying to change the demographics of schools, the Department wants to change the demographics of professions nationwide.

The Department can rely only on its actual interest—not one made up during litigation. Racial balancing cannot be relabeled "diversity," for example. *Parents Involved in Comm. Schs.*, 551 U.S. at 732. Even if it could be though, the United States Supreme Court has made clear that diversity is not a compelling interest because it is "not sufficiently coherent" to be "measure[d]." *SFFA*, 600 U.S. at 214. In contrast, a court can discern whether "temporary racial segregation of inmates" during a prison riot did (or was at least likely to) prevent violence, but whether a particular mix of minorities will somehow make a profession better is standardless. *See id.* at 215.

The Department also cannot establish that the racial eligibility criterion serves a remedial interest. Such an interest rises to the level of "compelling" only when the discrimination has been

12

"identified" with "specificity" and the imposed racial classifications are backed by a "strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) (citation omitted). Notably, the government must have this "strong" basis in evidence "*before*"—not after—"it embarks on an affirmative-action program." *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022) (per curiam). Also, the Department would have to show that it had a hand in the discrimination. *See SFFA*, 600 U.S. at 207; *Vitolo*, 999 F.3d at 361 (explaining "the government must have had a hand in the past discrimination it now seeks to remedy"). "[S]ocietal discrimination" in an industry or region cannot establish a compelling interest because a "generalized assertion" of discrimination provides "no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Hunt*, 517 U.S. at 909–10 (quoted source omitted).

When the McNair Program began, neither Congress nor the Department had such evidence. At most, they had evidence of "statistical disparities," but disparities prove little. While disparity studies have sometimes been used to establish intentional discrimination, they "don't cut it" when the alleged discrimination occurs in a complex situation involving numerous factors and parties. *Vitolo*, 999 F.3d at 361–62. This action, for example, does not involve a single hiring manager who interviewed 100 people, 90 of whom were blacks, and then hired 10 non-blacks; accordingly, such studies will be unhelpful to this Court.[7]

---

[7] Several courts have cautioned against reliance on such studies in similarly complex situations. *See Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 466 (8th Cir. 2004) (explaining "even the best regression equation . . . cannot prove causation"); *see also Ultima Servs. Corps. v. U.S. Dep't of Argric.*, 683 F. Supp. 3d 745, 767 (E.D. Tenn. 2023) (rejecting a study because it "did not eliminate . . . [non-discriminatory] variables that could explain the disparities"); *McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) ("Raw statistical disparities prove little; they certainly do not prove *intentional* discrimination."); *Eng'g Contractors Ass'n*, 122 F.3d at 917, 922 (describing the importance of accounting for known non-discriminatory factors in proving intentional discrimination and also rejecting an argument "that any significant disparities that exist after [accounting for known factors] . . . must [necessarily] be due to the ongoing effects of . . . discrimination"); *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) (explaining disparity studies are "essentially worthless" if they do not control for all relevant variables).

2.      Additionally, the racial eligibility criterion is not narrowly tailored for several reasons. As explained by the United States Supreme Court, "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Comm. Schs.*, 551 U.S. at 720 (majority opinion). The criteria lack said connection.

First, the racial eligibility criterion are over and under-inclusive. *See SFFA*, 600 U.S. at 216. Does the Department have evidence that only their racial groups are underrepresented? Are other racial groups such as students from Gaza, Libya, Yemen, Bangladesh, and Brazil not underrepresented like blacks and Hispanics? The categorizations lack even a "meaningful connection" to any possible compelling interest. *See id.* at 215.

Second, the Department cannot establish the so-called *Paradise* factors for narrow tailoring. *See United States v. Paradise*, 480 U.S. 149, 171 (1987). In that precedent, the United States Supreme Court instructed that "several factors" should be considered: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Id.*

The racial eligibility criterion is inconsistent with several *Paradise* factors. The Department could use "race-neutral alternative[s]" (i.e., alternative remedies) to achieve any compelling interest the government might have. *See Wis. Legislature*, 595 U.S. at 406. For example, if the proffered interest is to help disadvantaged undergraduate students who have faced discrimination, this interest would be better served by having applicants write an essay explaining their experience. *See SFFA*, 600 U.S. at 230. Next, the use of race is rigid rather than flexible. *See Paradise*, 480 U.S. at 171. No middle or upper class Asian or white students will ever be eligible.

14

The Department could look at using a waiver provision. *See id.* Although still probably unconstitutional, the Department could presume that members of certain racial categories are disadvantaged but allow non-members to somehow establish that they are similarly disadvantaged. Lastly, "third parties," like Plaintiffs, are innocent bystanders in the Department's social-engineering project and ultimately bear the burden of racial balancing. *See id.*

**B.    The racial eligibility criterion does not comply with the twin commands.**

After explaining why the admissions policies failed strict scrutiny, the United States Supreme Court held "[t]he race-based admissions systems . . . also fail to comply with the twin commands . . . ." *SFFA*, 600 U.S. at 218. As the Court reasoned, "[c]ollege admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* 218–19. In a zero-sum situation, effectively any consideration of race is necessarily negative. *Id.* Additionally, the Court said that the policies were "infirm for a second reason as well": "We have long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.' " *Id.* at 219 (quoted source omitted); *see also id.* at 220 (faulting the admissions policies for resting on the stereotype that "a black student can usually bring something that a white person cannot offer").

The McNair Program uses race as a "negative" because some undergraduate students, like Plaintiffs Durfee and Rothove, are not considered on equal footing with similarly situated undergraduate students of other races (indeed, they are not considered at all because of their race). The Department, and the various universities, are using finite government resources to help some students and not others. *See Nuziard v. Minority Bus. Dev. Agency*, __ F. Supp. 3d __, 2024 WL 965299, at *36 (N.D. Tex. Mar. 5, 2024) ("Absent a theoretical program with boundless

15

coffers, most federal benefits are 'zero sum' to a degree. . . . MBDA Business Centers have finite resources and offer finite services. A Black man or a Hawaiian woman automatically gets in the door; a Romanian man or a Libyan woman does not."). At bottom, by treating people as members of a "group" (the word used in the statute and regulations), the racial eligibility criterion creates in and out groups, thereby using race as a negative.[8]

The racial eligibility criterion is also the product of racial stereotypes. The Department presumes that all undergraduate students within their preferred racial categories are similarly "underrepresented" and need help, which is illegal—and non-sensical. *See SFFA*, 600 U.S. at 219; *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoted source omitted) ("[Racial] [c]lassifications . . . 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' . . . They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility.").

For example, the racial eligibility criterion lumps together all Asians. Notably, about 60 percent of the world's population lives in Asia. *SFFA*, 600 U.S. at 291–92 (Gorsuch, J., concurring). These people have different "cultures," "historical experience[s]," and "language[s]." *Id.* at 292. Yet the Department treats these people as if they are all the same. For example, Hmong may be underrepresented in graduate studies but by treating them as Asian, this issue is overlooked. Similarly, a family who came from Vietnam after the Fall of Saigon is presumed to be in no need

---

[8] The racial eligibility criterion is even more offensive than the use of race in the admissions policies recently held unconstitutional. That action involved a dispute about "*how much*" race was being considered. *SFFA*, 600 U.S. at 298 (Gorsuch, J., concurring). As summarized in one concurrence, "[b]oth schools insist that they consider race as just one of many factors when making admissions decisions in their self-described 'holistic' review of each applicant," while the plaintiff said that "whatever label the universities use to describe their processes, they intentionally consult race and, by design, their race-based tips and plusses benefit applicants of certain groups to the detriment of others." *Id.* Unlike those policies, the criterion makes race dispositive.

of help on the apparent theory that families who immigrated from elsewhere in Asia do not need help and that the Vietnamese family is sufficiently like these other families.

As another example, the racial eligibility criterion lumps together all whites. Plaintiff Durfee grew up in a rural community. Doc. 1., ¶12. Rural whites are, by any fair definition, underrepresented in elite parts of society. She, however, is assumed to be well represented and in no need of help. These assumptions are based on how other whites, who grew up in different environments, are doing.

Accordingly, the racial eligibility criterion fails both of the twin commands.

C.    **The racial eligibility criterion lacks a logical end point.**

Lastly, the McNair Program's racial eligibility criterion lacks a "logical end point." *SFFA*, 600 U.S. at 221 (majority opinion). The United States Supreme Court has stated that an affirmative action program should last no more than twenty to twenty-five years. *Id.* at 224–25. At some point, either a program has succeeded (and, therefore, is no longer needed), or it has demonstrated an inability to achieve the proffered interest. *See id.* Notably, "periodic review" (and Plaintiffs are unaware of any) is insufficient. *Id.* at 225. Any such reviews must be conducted with an end point in mind. The McNair Program is well past the 25-year mark.

## II.    **Plaintiffs will be irreparably injured in the absence of a preliminary injunction.**

Plaintiffs will be irreparably injured if this Court does not act. As explained by the Eighth Circuit, "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789 (8th Cir. 2010). As already explained, irreparable harm is presumed in the context of constitutional claims. Even if that presumption does not apply for some reason, irreparable need never be established "with certainty." *See Sleep Number*, 33 F.4th at 1018.

17

The injury for an equal protection claim is twofold. First, "the denial of equal treatment" during an application process is a standalone injury. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("Adarand's claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion to a legally protected interest . . . . Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract."). Accordingly, at most, Plaintiffs need only prove that they are likely to be treated differently because of their race—not that they would ultimately be accepted into their universities' respective projects.

Second, at least Plaintiffs Durfee and Rothove have suffered a stigmatizing injury because they were personally told that they cannot apply because of their race. *See Heckler v. Matthews*, 465 U.S. 728, 739–40 (1984) ("[D]iscrimination itself . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."); *Moore v. U.S. Dep't of Argic. ex rel. Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) ("The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing.").

To the extent these injuries are not already irreparable, they will become irreparable in the absence of a preliminary injunction. This Court is unlikely to issue permanent relief before application periods close. After that point, Plaintiffs will be unable to compete, and federal funds expended will be difficult (likely impossible) to claw back. This Court will be unable to do much for Plaintiffs.

**III.    The balance of harms and public interest favor a preliminary injunction.**

As already explained, the last two factors merge in this action because an administrative agency is the defendant. The Eighth Circuit has instructed that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *D.M.*, 917 F.3d at 1004. Accordingly, the last two factors weigh in favor of a preliminary injunction.

**IV.    The preliminary injunction should be either universal or at least apply to all universities at which Plaintiffs have members.**

"[P]rinciples of equity jurisprudence" mandate that "the scope of injunctive relief is dictated by the extent of the violation established . . . ." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Crafting such remedies is "a special blend" of "what is necessary, what is fair, and what is workable." *Id.* (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973)); *see also Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (explaining part of the inquiry is to minimize the burden to the defendant while providing complete and workable relief to the plaintiff).

For several reasons, universal relief, i.e., relief beyond the parties, is appropriate. First, the extent of the constitutional violation is widespread. Defendants operate the program at 216 colleges and universities for nearly 6,000 students, at a cost of over $60 million. Doc. 1, ¶20.

Second, and relatedly, universal relief is favored in this circuit when one plaintiff provides "nationwide" student-related services given obvious workability concerns. *Nebraska*, 52 F.4th at 1048. In this action, Plaintiff YAF has thousands of members at institutions of higher education across the nation.

Lastly, this action is brought partly under 5 U.S.C. § 706(2)(B), which states that a district court "shall hold unlawful and set aside agency action . . . found to be contrary to constitutional right, power, privilege, or immunity." "Set aside" means "vacate[]" entirely—as if to have never

existed in the first place. *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring). "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 780 (5th Cir. 2024) (explaining vacatur is "statutorily permissible" and "required" in the Fifth Circuit). This Court will (assuming Plaintiffs are successful), need to vacate the challenged regulations. As the Eighth Circuit has said, "a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *Rodgers*, 942 F.3d at 458. Accordingly, universal relief is appropriate now because it is effectively what Plaintiffs will ultimately obtain.[9] *See also* 5 U.S.C. § 705 (authorizing a district court to "postpone" agency action).

## CONCLUSION

This Court should grant the motion for a preliminary injunction.

Dated: September 4, 2024

WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.

*/s/ Skylar Croy*
Richard M. Esenberg
Daniel P. Lennington
Skylar Croy
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Fax: (414) 727-6385
Rick@will-law.org

---

[9] If the Court is not inclined to offer universal relief, Plaintiffs will, at the Court's request, provide a list of schools where Plaintiff YAF has members and that also have McNair Programs. This option would afford the Department the opportunity to communicate directly with specific institutions and instruct them that the race-based criterion is no longer enforceable.

Dan@will-law.org
Skylar@will-law.org

*Attorneys for Plaintiffs*