## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| Young Americans for Freedom, Young America's Foundation, Avery Durfee, and Benjamin Rothove,<br><br>                  Plaintiffs,<br><br>vs.<br><br>U.S. Department of Education and Miguel Cardona,<br><br>                  Defendants. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 3:24-cv-163 |

The Ronald E. McNair Postbaccalaureate Achievement Program (the "McNair Program") was established by Congress in 1987. The McNair Program, administered by the United States Department of Education, along with participating higher education institutions, was "designed to provide disadvantaged college students with effective preparation for doctoral study." 20 U.S.C. § 1070a-15(a). It does this, in part, by providing financial assistance to Program participants. But to participate in the McNair Program, a student must be eligible. The statute has two eligibility paths: one for students who are low-income, first-generation college students, and another for students who belong to an underrepresented group in graduate education. "Underrepresented" is defined by statute and regulation to include only certain races. It is the racial eligibility criteria that the Plaintiffs assert is unlawful under the Equal Protection Clause. They move to enjoin the Department of Education from enforcing the racial eligibility criteria.

**I.     BACKGROUND**

The Plaintiffs are two organizations and two students: the Young America's Foundation, Young Americans for Freedom, Avery Durfee, and Benjamin Rothove. The Young America's

Foundation and Young Americans for Freedom are national student organizations. Doc. 1, p. 3. Young Americans for Freedom has a chapter at the University of North Dakota ("UND") and the University of Wisconsin-Madison ("UW-Madison"). Id. at 3, 14. Avery Durfee is a third-year student at UND and a member of the UND Young Americans for Freedom Chapter. Id. at 3. Benjamin Rothove is a sophomore political science and economics student at UW-Madison and a member of the Young Americans for Freedom. Id. at 4. The Defendants are the Department of Education and its current Secretary, Miguel Cardona. Id. at 4-5. The Department administers the McNair Program, with participating higher education institutions, pursuant to 20 U.S.C. § 1070a-15 and 34 C.F.R. § 647.

The McNair Program provides students with resources such as "opportunities for research or other scholarly activities," internships, seminars, tutoring, academic counseling, and "activities designed to assist students participating in the project in securing admission to and financial assistance for enrollment in graduate programs." 20 U.S.C. § 1070a-15(b). The Program also permits funding to be used for "education or counseling services designed to improve the financial literacy and economic literacy of students," mentoring, and "exposure to cultural events and academic programs not usually available to disadvantaged students." 20 U.S.C. § 1070a-15(c).

The admission and funding mechanics under the McNair Program are layered. They involve the Department, as the federal agency on the one hand, and participating higher education institutions, on the other. For the Department's part, it awards monetary grants to higher education institutions that apply for funding "to carry out McNair projects." 34 C.F.R. § 647.2. These competitive grants are awarded every five years. The latest round of grants was awarded in 2022, which means the Department will not award any further grants until 2027. Doc. 9-1, p. 3; 20 U.S.C. § 1070a-11(b). To apply for funding, the higher education institutions must provide:

2

> (1) an assurance that not less than two-thirds of the individuals participating in the project proposed to be carried out under any application be low-income individuals who are first generation college students;
>
> (2) an assurance that the remaining persons participating in the project proposed to be carried out be from a group that is underrepresented in graduate education, including--
>
>> (A) Alaska Natives, as defined in section 7546 of this title;
>>
>> (B) Native Hawaiians, as defined in section 7517 of this title; and
>>
>> (C) Native American Pacific Islanders, as defined in section 1059g of this title;
>
> (3) an assurance that participants be enrolled in a degree program at an eligible institution having an agreement with the Secretary in accordance with the provisions of section 1094 of this title; and
>
> (4) an assurance that participants in summer research internships have completed their sophomore year in postsecondary education.

20 U.S.C. § 1070a-15(d). The Department also requires, like 20 U.S.C. § 1070a-15(d), a student receiving financial assistance be:

> (1) A low-income individual who is a first-generation college student;
>
> (2) A member of a group that is underrepresented in graduate education; or
>
> (3) A member of a group that is not listed in § 647.7 if the group is underrepresented in certain academic disciplines as documented by standard statistical references or other national survey data submitted to and accepted by the Secretary on a case-by-case basis.

34 C.F.R. § 647.3(c). "Low-income" is defined as "an individual whose family's taxable income did not exceed 150 percent of the poverty level . . . ." 34 C.F.R. § 647.7. "Groups underrepresented in graduate education" are:

> Black (non-Hispanic), Hispanic, American Indian, Alaskan Native (as defined in section 7306 of the Elementary and Secondary Education Act of 1965, as amended (ESEA)), Native Hawaiians (as defined in section 7207 of the ESEA), and Native American Pacific Islanders (as defined in section 320 of the HEA).

34 C.F.R. § 647.7.

The higher education institutions' have flexibility in both the development and application of the McNair Program criteria. The institutions can add other, additional requirements, or, as some institutions currently do, the institutions can elect to not apply the racial eligibility criteria and only admit participants via the low-income, first-generation eligibility criteria. Doc. 9, p. 13. Relevant here, UND requires students to have completed 60 credits, have a minimum 3.00 grade point average, plan to complete a Ph.D., and more broadly, be "[c]reative, independent undergraduates with good writing skills" and "[i]ntellectually curious and interested in conducting research under faculty guidance." University of North Dakota, *McNair Program*, https://und.edu/student-life/trio/mcnair-program/index.html (last visited Dec. 1, 2024). UW-Madison requires students to have completed 45 credits, have a minimum 2.8 grade point average, and be "[a]ble to participate in the program for a minimum of 12 full months (including a full summer)[.]" McNair Scholars Program, *Eligibility*, https://mcnair.wisc.edu/become-a-mcnair-scholar/ (last visited Nov. 1, 2024). UND uses rolling admissions for the McNair Program, and UW-Madison uses a set admission window from about mid-August to October 1. Doc. 15, p. 20; Doc. 1, p. 18. Currently, as far as this Court is aware, both UND and UW-Madison screen and select applicants using the racial eligibility criteria.

Durfee and Rothove allege they are interested in the McNair Program because they plan to pursue graduate studies. Doc. 1, pp. 3, 4. Both Durfee and Rothove inquired about—but did not apply for—the McNair Program at their universities. Durfee claims that she "is ready and able to apply for the McNair Program (and its Pre-McNair Academy subcomponent), but given that Durfee is white, and not a low-income college student, she did not apply for the McNair Program. She will not apply so long as that racial requirement remains in effect." Id. at 14. She asserts that the "racial eligibility requirement [is] a harm to her personal dignity" and "her ability to apply on

4

equal footing for the McNair Program and obtain all its direct and indirect benefits." Id. Rothove also "has not and will not apply to the McNair Program so long as the racial eligibility requirement remains." Id. at 18. He asserts that the "racial eligibility requirement [is] a harm to his personal dignity" and "harms his ability to apply on equal footing for the McNair Program and obtain all its direct and indirect benefits." Id. The Young America's Foundation and Young Americans for Freedom claim they have other "members who are able and ready to apply for the McNair Program but are ineligible because of their race." Id. at 21.

The Plaintiffs filed this case alleging the racial eligibility criteria of the McNair Program violates the Equal Protection Clause of the United States Constitution, and the regulatory racial eligibility criteria violates the Administrative Procedure Act. Doc. 1. The Plaintiffs move for a preliminary injunction "prohibiting Defendants from enforcing or otherwise implementing the racial and ethnic classifications in 20 U.S.C. §1070a- 15(d) and 34 C.F.R. §§ 647.3 and 647.7." Doc. 7., p. 1. The Court held a hearing on the motion for a preliminary injunction on October 16, 2024. Doc. 13.

## II.     LAW AND DISCUSSION

The central dispute between the parties is not on the merits of the Plaintiffs' case[1]—it is standing. The Department argues the Plaintiffs lack standing because, among other things, their alleged injuries are not redressable. "Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." The "case or controversy" requirement is fundamental to the judiciary's proper role in our system of government." Murthy v. Missouri, 144 S. Ct. 1972,

---

[1] Indeed, given recent United States Supreme Court decisions, including Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181 (2023), it seems likely the racial eligibility criteria fails to satisfy strict scrutiny. No doubt this is why many higher education institutions have proactively decided to no longer apply it.

1985 (2024) (quotations and citations omitted). "Standing to sue under Article III 'is the threshold question in every federal case . . . .'" Becker v. North Dakota Univ. Sys., 112 F.4th 592, 595 (8th Cir. 2024) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

"To demonstrate Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Henderson v. Springfield R-12 Sch. Dist., 116 F.4th 804, 809 (8th Cir. 2024) (quotations and citation omitted). "Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements." Arc of Iowa v. Reynolds, 94 F.4th 707, 710 (8th Cir. 2024). "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Murthy, 144 S. Ct. at 1986 (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).

The Department first argues that the Plaintiffs' alleged injuries are speculative and hypothetical for two reasons—(1) neither Durfee nor Rothove applied to the McNair Program; and (2) even if they had applied, neither would be eligible for the McNair Program (irrespective of the racial eligibility criteria) because they would both fail to meet the low-income, first-generation eligibility criteria. It is factually true that neither applied to the McNair Program. But in an Equal Protection case, that fact does not necessarily negate there being an injury in fact. The injury in fact requirement turns on how the injury is characterized. Here, as alleged by the Plaintiffs, the injury is "the denial of equal treatment" during the application and admission process. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993). Put simply, the Plaintiffs allege they are injured because they are being treated differently because

of their race. In an Equal Protection context, that injury is typically sufficient to establish an injury in fact. See id., Gratz v. Bollinger, 539 U.S. 244, 262 (2003).

What presents a closer question is the third standing requirement—redressability. "Redressability exists when a favorable decision will relieve the plaintiffs of a discrete injury, even if it does not relieve them of every injury or if the risk of injury 'would be reduced to some extent if [the plaintiffs] received the relief they seek.'" Animal Legal Def. Fund v. Reynolds, 89 F.4th 1071, 1078 (8th Cir. 2024) (quoting Massachusetts v. E.P.A., 549 U.S. 497, 526 (2007)). "Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." Haaland v. Brackeen, 599 U.S. 255, 294 (2023) (quoting Franklin v. Massachusetts, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment) (emphasis in original).

Recall that the Department awards competitive five-year grants to higher education institutions that then administer the McNair Program on their campuses. 20 U.S.C. § 1070a-11. Once the funding is awarded, the higher education institutions—not the Department—select applicants and administer the Program. There is nothing in the record that indicates that the Department has any control over the grants once allocated to the institutions. The Plaintiffs were asked this question at the hearing:

> **THE COURT:** The Department of Education makes five-year grants to universities for the McNair Program. Correct?
>
> **MR. CROY:** Correct, Your Honor.
>
> **THE COURT:** And the last one was in 2022, and the next one is in 2027. Correct?
>
> **MR. CROY:** I think that's correct, Your Honor. To be honest, I would have to double-check on this.
>
> **THE COURT**: Okay. So I'm pretty sure that's correct. So the funding has been allocated to the universities, and what control does the Department of Education have over the funding that was already allocated?

> **MR. CROY:** Your Honor, again, I would go back to the statute and the regulation itself are both overseen by the Secretary of Education.
>
> **THE COURT:** But what control do they have over that?
>
> **MR. CROY:** Well, they're the ones, Your Honor, that required the assurances in the first place in the grant application process about not less than two-thirds remainder coming from another. I would presume, Your Honor, there probably is some oversight past that to make sure that the grants are actually being complied with, but I don't -- I don't actually know the answer on that, Your Honor.

Doc. 15, pp. 48-49. The Court asked the Department the same question:

> **THE COURT:** I had asked this – I've asked this once, but I'm just going to ask it again to make sure that I understand it correctly. The Department of Education does enforce the McNair Program, but the role that the Department of Education has in enforcing it is really mostly pre-allocation of money. Maybe there's some quality control checks that are out there and something that happens after that, but really, beyond that, it's just pre-allocation of money and then move on to the next phase. Is that a fair statement?
>
> **MR. CLENDENEN:** Your Honor, I think that's mostly fair just based on what -- the information we have available. Most of the -- the sort of heavy lifting that the Department of Education does is in deciding what schools get the grants, which is a five-year cycle. After the schools get the grants, they still have to send those assurances, the assurances in the statute that, you know, at least two-thirds are low-income and that anyone else fits under the underrepresented category. They have to send those to the Department of Education. I don't think there's anything that the Department has to do other than just receive those. And then under the regulation (c)(3) bucket, if schools are trying to do a case-by-case statistical analysis to show, you know, for example, you know, transgender students in physics are underrepresented, then that goes to the Department of Education for approval, too. But other than that, I don't believe there's anything in the -- in the -- in the record that the Department of Education really does as far as, like, a quality check.

Id. at 78-79.

As the record shows, the Plaintiffs' alleged injuries will not be redressed by an injunction and favorable decision because the higher education institutions are also part of the administration of the Program. And beyond that, those institutions already received funding from the Department for the McNair Program through 2027. So, through 2027, UND and UW-Madison exclusively control the McNair Program's admission decisions and its funding allocation to admitted

8

participants, not the Department. Problematically though, UND and UW-Madison are not parties. A favorable decision for the Plaintiffs would not remedy the injuries because UND and UW-Madison are not bound by the Court's order and decision.

Said another way, the Court has no recourse in preventing UND and UW-Madison from continuing to admit students under the challenged criteria. The Plaintiffs specifically ask for injunctions: (1) prohibiting the Department "from enforcing or otherwise implementing the racial and ethnic classifications in 20 U.S.C. §1070a– 15(d) and 34 C.F.R. §§ 647.3 and 647.7" and (2) requiring that the Department notify universities participating in the McNair Program that they cannot impose or rely in these classifications.[2] Doc. 7, p. 1. But the injunctive relief and order would not be against UND or UW-Madison because they are not parties. Again, "[r]edressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." Haaland, 599 U.S. at 294 (emphasis in the original). Any order in this case as to UND and UW-Madison would have only persuasive impact because the institutions are not parties. Providing the Plaintiffs' requested "notice" to UND and UW-Madison is akin to this Court simply explaining the exercise of its power, without actual control over those institutions.

---

[2] Even assuming that Plaintiffs have standing, there are concerns whether the Court can award this type of injunction. In Griffin v. HM Florida-ORL, LLC, the Supreme Court denied an application for a stay of a district court's judgment that enjoined Florida from enforcing a newly passed state law against the plaintiff and other non-parties to the litigation. 144 S. Ct. 1 (2023). In denying the stay, the Supreme Court stated that "[n]o federal statute expressly grants district courts the power to enter injunctions prohibiting government enforcement against non-parties in the circumstances presented in this case." Id. at 2. While Griffin was a First Amendment case, the Supreme Court noted more broadly "[t]he question of whether a district court, after holding that a law violates the Constitution, may nonetheless enjoin the government from enforcing that law against non-parties to the litigation is an important question that could warrant our review in the future." Id.

Haaland v. Brackeen is controlling and instructive. In that case, the Supreme Court dismissed for a lack of standing based on similar facts. In Haaland, a birth mother, along with foster and adoptive parents, sued the United States to challenge the constitutionality of the Indian Child Welfare Act. Id. at 264. The plaintiffs sought "an injunction preventing the federal parties from enforcing ICWA and a declaratory judgment that the challenged provisions are unconstitutional." Id. at 292. But the Supreme Court stated that "enjoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements." Id. at 292-93. The Supreme Court also explained:

> The state officials who implement ICWA are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced. So an injunction would not give petitioners legally enforceable protection from the allegedly imminent harm.

Id. at 293 (internal citation and quotations omitted).

The same is true here. While an injunction against the racial eligibility criteria in the statute and code would alter how funding is awarded by the Department in 2027, without the higher education institutions counterpart as parties, "an injunction would not give petitioners legally enforceable protection from the allegedly imminent harm." Id. And of course, "[w]ithout preclusive effect, a declaratory judgment is little more than an advisory opinion." Id. (citing Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 242-43 (1952)).

Because the Department does not control the funding and admissions for the McNair Program exclusively, and because UND and UW-Madison (as the higher education counterpart to the Department) are not parties, the Plaintiffs' alleged injuries are not redressable by a favorable

decision. And because the injuries are not redressable, given the specific posture and parties of this case, the Plaintiffs lack Article III standing.[3]

### III.     CONCLUSION

Again, the merits of this case are largely undisputed. But the McNair Program is not exclusively administered by the Department. The appropriate higher education institutions that also administer and develop the Program are missing from this case. Without those institutions, the Plaintiffs' alleged injuries are not redressable. Given the lack of Article III standing, the Plaintiffs' motion for a preliminary injunction (Doc. 7) is **DENIED**, and the case is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

**IT IS SO ORDERED. LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 31st day of December, 2024.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court

---

[3] A lack of redressability axiomatically also results in a lack of associational standing for Young Americans for Freedom and the Young America's Foundation.